**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

CALLOWAY CLEANING &
RESTORATION, INC.,

        Plaintiff,

      v.

ROBERT T. BURER, et al.,

        Defendants.

Case No. 1:22-cv-12

Bowman, M.J.

**MEMORANDUM OPINION AND ORDER[1]**

## I.    Background

Plaintiff Calloway Cleaning & Restoration Inc. ("Calloway") filed suit against Defendants Robert Burer ("Burer") and his company, 1 Call Away Restoration LLC ("1 Call Away") in January 2022, alleging that Defendants are liable for deceptive trade practices under Ohio law, trademark violations under the Lanham Act, tortious interference with contractual and business relationships, conversion of Plaintiff's property, defamation, breach of a fiduciary duty, misappropriation of confidential, trade secret and proprietary information, and civil conspiracy. Defendant Burer counterclaimed for unjust enrichment and conversion. Prior to trial, the Court permitted defense counsel to withdraw, entered a default against both Defendants, and dismissed Defendant Burer's counterclaim. (Docs. 48, 60). Thereafter, Calloway withdrew its jury demand, Burer consented to the withdrawal of the jury demand, and a bench trial was conducted to

---

[1]The parties consented to proceeding before the undersigned magistrate judge under 28 U.S.C. § 636(c). (Doc. 19).

determine damages. Calloway was represented by counsel; Defendant Burer appeared pro se, while 1 Call Away did not appear.

## II.     Findings of Fact[2]

At trial, the Court heard sworn testimony from four witnesses: Michele Calloway, Levona Robbins, Mike Bowman[3], and Robert Burer. The Court also considered multiple exhibits. As the finder of fact, the Court is the sole judge of the credibility of the witnesses. Based in part on the personal animus between Ms. Calloway, Ms. Robbins and Mr. Burer, and their questionable motivations, the Court found portions of the testimony of all three to be less than fully credible. The Court now sets forth its findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).

### A. The Parties' Personal and Professional Relationships

James Calloway established the Calloway business in 2011. Calloway provides services ranging from carpet cleaning to demolition, waste disposal and reconstruction/restoration of residential and commercial buildings, personal property and equipment. Calloway provides such services to clients whose property is damaged by water, fire, mold, or other calamities. On May 29, 2012, Calloway registered its trademarked name and logo: "CALLOWAY CLEANING & RESTORATION Help is just a call-o-way." (PX1).

Michele Calloway was married to Defendant Robert "Bobby" Burer in 2005, but filed for divorce roughly eighteen months later. Following her divorce, Michele married

---

[2]For the sake of judicial economy, the Court has endeavored to limit its written Findings of Fact to those most relevant to the claims asserted and damages arising therefrom. For that reason, the Court finds no need to discuss many irrelevant and inflammatory statements made by Mr. Burer.
[3]To eliminate any question, Mike Bowman is not related to the Undersigned.

James Calloway. James died in 2019, leaving Ms. Calloway[4] as sole owner and President of Calloway. After James died, Burer began texting Ms. Calloway, sending positive and reaffirming messages.  Ms. Calloway then learned that Burer was now sober. The two renewed their romantic relationship in 2020 and eventually began living together in Ms. Calloway's home. During the tenure of their second relationship, they freely mixed business with pleasure. But their second union proved shorter than their first, dissolving on or about August 27, 2021. This lawsuit represents the fallout.

When the pair reunited, Burer offered to help with Calloway; Ms. Calloway gladly accepted. From September through December 2020, Burer worked at Calloway in an unpaid capacity,[5] while also working for at least one Burer family owned business, T.B. Properties Management. He also spent time at sobriety meetings and sponsoring others on his same path of sobriety. As Burer increased his Calloway workload, Ms. Calloway agreed to put him on the payroll. In January 2021, Calloway hired Burer as General Manager ("GM") at a rate of $2,000 per week, with intermittent $1,000 "discretionary" bonuses made by Ms. Calloway.

Ms. Calloway initially had great faith in Burer's abilities and paid for Burer to obtain restoration certifications. In turn, Burer was an active manager, firing employees with performance and/or addiction issues and creating a new system whereby Calloway's calls were forwarded to his cell phone. But over the eight months during which Burer served as GM, the personal and professional relationship between the couple soured. On several occasions, Burer sought – and Ms. Calloway denied - an ownership interest in Calloway.

---

[4]The title "Ms." is used to distinguish between the business entity (Calloway) that is the Plaintiff in this case, and its individual owner, Michele Calloway.
[5]After his departure, Burer sought compensation for this period, disputing Calloway's position that he worked only in a "volunteer" capacity

Near the end of Burer's tenure, Ms. Calloway's mother, Levona Robbins, began working at Calloway. In mid-August 2021, Ms. Calloway and Burer took a cruise together. Robbins called her daughter to inquire what she should do with company checks. Listening in, Burer responded angrily, sending Robbins a text that expressed his irritation that Robbins had consulted her daughter rather than him as GM, and accusing Robbins of interfering in their relationship. Burer's text states that the incident "reminded me that if I don't have any ownership in this [business] immediately I'm not going to proceed…" On August 27, 2021, Burer parted ways with Ms. Calloway and her company.

Because he was an at-will employee, Calloway could have fired him at any time. Ms. Calloway maintains she did not fire him, despite testifying that Burer was a poor manager who became verbally abusive. While some employees were fired by Burer, Ms. Calloway testified that others left because they were unhappy with him. By the time Burer left, just two employees remained.

For his part, Burer had signed no confidentiality, non-compete, or non-solicitation agreement with Calloway. Free to set up a competing business upon his departure, he immediately did so. Still, Calloway alleges that Burer violated the law in multiple ways. Calloway now seeks damages based on misconduct alleged to have occurred over three distinct time periods: (1) during the fall of 2020 when Burer and Ms. Calloway renewed their relationship; (2) on August 27, 2021 when that relationship imploded and Burer departed Calloway; and (3) after Burer's departure when he formed 1 Call Away as a competing business.

4

**B. Burer's Conduct During the Relationship**

**1. Bills from the Burer Garage**

Two of Calloway's damage claims[6] relate to the Burer Garage, a business operated by Burer's father in which Burer has an undefined ownership interest. Burer Garage began servicing Calloway vehicles in the fall of 2020 and continued those services throughout the couple's relationship. Calloway contends that Burer owes damages for overcharges by Burer Garage during the relationship, and for failing to reduce certain invoices by an agreed upon "offset."

Calloway's evidence was insufficient to prove the alleged overcharges. It was only after Burer departed that Ms. Calloway came to believe that Burer Garage had overcharged Calloway. She was unable to state an exact amount but in retrospective analysis, questioned charges totaling $5,000. Ms. Calloway's testimony on this issue was highly speculative and not credible.

Ms. Calloway's testimony about the offset was somewhat more credible. On November 3, 2020, a property owned by T.B. Properties Management sustained significant fire damage.[7] Calloway performed remedial work and invoiced T.B. Properties on December 12, 2020 for $12,180.34. The next day, Calloway paid $7,927.71 to Burer Garage for previously performed maintenance work. Around that time, Burer and Ms. Calloway verbally agreed that Burer would arrange for Calloway's pending invoice to T.B. Properties to be offset against future maintenance service by Burer Garage.

Other than the single payment made to Burer Garage in December 2020, Calloway made no further payments for mechanic services prior to Burer's August 2021 departure

---

[6]Calloway presented Exhibit PX33 as its itemized list of damages.
[7]At the time, the property was rented to a bar/restaurant identified as Mango's Bar & Grille.

from Calloway. By that point, Calloway's outstanding balance at Burer Garage had grown to $17,478.04. Burer Garage refused to reduce its bill and would not release the vehicles still in its possession without full payment. Calloway paid the bill in September 2021 - without the requested offset. Despite relatively weak proof of the offset agreement[8] and ambiguities about the relationships between Burer and the two family businesses,[9] Burer did not contest the existence of the offset agreement. Proof of damages in the amount of the unpaid restoration invoice was therefore unrebutted.

### 2. Retained Furniture and Gift Cards

Calloway's list of damages includes sums for the conversion of equipment and gift cards. At trial, Calloway also alleged that Burer wrongfully retained or converted Calloway furniture.[10] The latter claim arose from Burer's October 2020 receipt of furniture purchased by Calloway for use at an apartment in Cedar Rapids, Iowa, during a period when he/Calloway were working there. After completion of the job, on an unspecified date, Burer directed the furniture to be transported to a warehouse. Later, Ms. Calloway verbally requested the return of the furniture, which was not returned. No details were provided concerning how long the furniture was used, when Ms. Calloway requested its return, or why Calloway believed that Burer maintained possession or control of it at the warehouse.

---

[8]Neither the date of the parties' agreement nor the date or dates that Ms. Calloway asked for the offset to be applied were in evidence.

[9]The ownership interests held by Burer in each family business and relationship between Burer's Garage (which agreed to the offset) and T.B. Properties (the entity that owed money to Calloway) were not explained in great detail.

[10]Many of the allegations of the complaint varied from the evidence presented at trial. For example, the complaint alleges the conversion of $3,000.00 in gift cards. At trial, however, the evidence showed that Calloway purchased only $1,500.00 in gift cards.

In addition to the value of the furniture, Calloway seeks $1,500.00 as reimbursement for $50 gift cards purchased from a local restaurant by Ms. Calloway and Burer on December 22, 2020.[11] Inconsistently, Ms. Calloway testified that Burer took possession of the gift cards the night they were purchased, but later stated that he removed them from a drawer when he left Calloway. She explained that Calloway purchased the gift cards to distribute as customer thank you gifts. But there was no evidence that she or Burer made any attempt to do so at any point during the following eight months. In any event, Ms. Calloway verbally requested the return of the gift cards on an unspecified date, but they were not returned.

While underwhelming in its level of detail, Ms. Calloway's testimony about the furniture and gift cards was uncontested. Considering the record as a whole, the Court finds the testimony to be sufficient to establish, by a preponderance of the evidence, that Calloway suffered losses totaling $4,036.15 for the value of the furniture and $1,500.00 in gift cards.

### C. Burer's Conduct on August 27, 2021

Calloway's additional claim for the conversion of equipment arises from Burer's actions on August 27, 2021, the date when his relationship with Ms. Calloway and her company ended. When Burer left, he took with him a 16-passenger van that Ms. Calloway asserted was filled with equipment. Although she later recovered the van, Calloway accuses Burer of retaining the equipment for use in his new business. But Calloway

---

[11]Although Ms. Calloway testified that the gift cards were valued at $1593.79, the receipt that she referenced reflects the purchase of two meals and wine in addition to the gift cards. (*See* PX 4).

presented no evidence that Burer did in fact use Calloway's equipment.[12] And Ms. Calloway never filed a police report against Burer or an insurance claim.[13]

The evidence about what equipment was taken was wildly inconsistent.[14] Soon after Burer's departure, Calloway took inventory, an exercise that Ms. Calloway testified that Calloway performed "routinely" based on a history of prior loss. Calloway's partially handwritten notes reflect a large amount of "missing" inventory including 62 air movers and 5 dehumidifiers.[15] But Calloway offered no evidence about the date it had last taken inventory prior to Burer's departure. And Ms. Calloway stated that she was not accusing Burer of taking *all* of the missing inventory. In fact, the only specific equipment that she personally accused Burer of taking at trial was one dehumidifier, a camera and a moister meter.

Robbins offered testimony about two dehumidifiers, insofar as Burer left unfinished work and two dehumidifiers at the jobsite of a Mr. Shriver on August 27, 2021. When Burer did not return, Shriver left messages. But by the time that Calloway discovered those messages, Shriver had hired another company to finish the job and Burer had retrieved the dehumidifiers.

Consistent with her testimony about the gift cards and furniture, Ms. Calloway testified that she requested the return of any equipment taken by Burer on an unspecified date but that no equipment was returned. Despite the loss, Calloway did not purchase "replacement" equipment until nearly two years later. On July 27, 2023, Calloway spent

---

[12]There was no evidence that the equipment bore the "Calloway" logo or other identifying marks.
[13]By contrast, Ms. Calloway admitted she filed two insurance claims for other missing equipment.
[14]The complaint alleges equipment losses totaling $54,899, (Doc. 1 at ¶75), but at trial, Calloway claimed equipment losses totaling only $10,254.74. (*See* PX33).
[15]Another page of the same exhibit states that 15 dehumidifiers were missing. (*See* PX8, at 14).

$10,254.74 to purchase two new dehumidifiers, a hydrosensor, an air mover, a camera, a camera accessory identified as "FLIR C5 w/MSX & WIFI," and what the Court infers to be a moisture meter identified as "MMS3, Accessories & Thermoform."

The Court finds from a preponderance of the evidence that Burer absconded with two dehumidifiers from the Shriver job, one camera and a thermal imaging attachment, plus a moisture meter. By contrast, the Court finds insufficient proof (i.e., less than a preponderance) that Burer took a hydrosensor or air mover(s). The total replacement cost of the converted equipment equals $8,892.85 ($3,249.95 (dehumidifier 1) + $2,999.95 (dehumidifier 2) + $499.00 + $799.00 (camera and accessory) + $1,344.96 (moisture meter)). (PX8, last page). Calloway's exhibit also shows it paid .078 sales tax. Adding in sales tax yields a total cost of $9,586.49 for replacement equipment.

### D. Burer's Post-Calloway Conduct

#### 1. Unemployment Benefits Paid by Calloway

According to Ms. Calloway, Burer voluntarily quit on August 27, 2021 after she refused to give him an ownership interest. Ms. Calloway testified that "Bobby wanted back" but she believed his offer to be conditional on the grant or sale of an ownership interest. In contrast, Burer testified he was fired and not permitted to return.

An employee who voluntarily quits is ineligible for unemployment benefits. Nevertheless, Burer applied for and received state unemployment benefits beginning on August 30, 2021 based on "lack of work/layoff." Calloway appealed Burer's claim, asserting that Burer had failed to return to work without explanation. The Ohio Department of Job and Family Services denied Calloway's appeal and affirmed the benefits award. Calloway seeks damages in the amount of $11,454.00 for unemployment benefits. But

the Court credits Burer's testimony and the Ohio agency's determination over Ms. Calloway's testimony on this issue.[16]

### 2. Deceptive Practices/Lanham Act Violations

As stated, Burer was not bound by confidentiality, non-compete or non-solicitation agreements. He was free to set up a competing business and contact Calloway's customers. But Calloway rightly objects to the *way* in which Burer began to compete. Start with the name of Burer's new business: "1 Call Away Restoration, LLC." Calloway objects that the name of Burer's business is too close to Calloway's word and design trademark: "CALLOWAY CLEANING & RESTORATION *HELP IS JUST A CALL-O-WAY.*" (*See* PX1, emphasis added).

Burer registered "1 Call Away Restoration, LLC" with the State of Ohio on September 30, 2021. Although 1 Call Away had no employees other than Burer, he paid a contractor/friend to set up 1 Call Away's website, using images featuring *Calloway* employees working on *Calloway* jobs.[17] Burer also took advantage of the fact that Calloway's emergency number was still routed to his cell phone as it had been during his tenure as GM. It took nearly three weeks, until September 14, 2021, for Calloway to realize this and reroute the calls back to its office.

Calloway's automated system recorded the misdirected phone calls, providing date and time stamps as well as caller ID information.[18] Robbins listened to the recordings

---

[16]This litigation is not the proper forum to appeal the decision of ODJFS.
[17]Burer testified (incredibly) that he is unable to use a computer and can barely use a cell phone. The Court previously discredited Burer's feeble explanations for his failure to turn over discoverable business and tax records in Orders granting sanctions to Calloway. (*See* Docs. 41, 46-48, 59-60).
[18]Burer disputed the accuracy of the time stamps, citing his own forensic investigation. According to Burer, after the first day of trial, he and his father recharged his old cell phone and transferred its data to recover the messages. Burer testified that based on his analysis, the recordings were generated when he was still employed by Calloway. The Court denied Calloway's motion to strike Burer's testimony, choosing instead to consider its credibility. The Court finds the testimony to be incredible for the purpose for which it was

and followed up by contacting the callers. In recordings placed in evidence, Burer made false statements to prospective customers. Burer also misrepresented himself without clarifying that he was not the Calloway business. When a caller on September 1 asked "Is this Calloway Cleaning?" Burer responded affirmatively. When a caller on September 8 inquired if he was speaking to "Mr. Calloway," Burer also responded affirmatively.[19] On September 13, 2021, a caller asked to speak to "Michele," a reference to Ms. Calloway. Burer told the caller that he was "handling all that business now," was "in charge now" and was "an owner," intentionally misleading the caller to believe that he was running Calloway.

During the calls, Burer would ask for the customer's name and number or ask them to call him back on his cell phone, apparently for the purpose of bidding out the new business for himself. (*See* PX36, Sept. 1, 2020 recording of Burer stating he was giving the caller his personal cell phone "so you don't have to go back through the office"). But on other occasions Burer intentionally made statements that were false about Calloway, either out of spite or because his own business (1 Call Away) lacked the manpower or equipment to perform the requested work.[20] For instance, to a caller on September 9

---

offered. However, the evidence adds to the Court's prior conclusions concerning Burer's deception and concealment of relevant evidence during discovery in this case. (*See* PX29, Deposition testimony at 68, testifying that the data was not recoverable and that he did not produce the "destroyed" phone because he "turned it in" to the phone company when he got a new phone).

[19]Only a portion of the September 8 call was played in Court, but the full recording was admitted into evidence. The full recording reveals that the caller was not a current prospective customer but a confused window salesman trying to recall why he had a Calloway business card. By the end of the call, Burer and the caller ascertained that: (1) Burer was not in the market for windows and the salesman/caller was not seeking restoration work; and (2) the business card had been left at a prior restoration job performed for the caller.

[20]Ms. Calloway testified that, unlike Burer's one-man outfit, Calloway was fully capable of taking on all new work. Despite suggesting that Calloway had no work crew left by the time Burer departed, she testified that many employees quickly returned. The Court found her testimony to be only partially credible given the lack of specificity on how many employees returned or when. Still, Burer did not rebut the testimony that Calloway either retained or quickly regained the necessary manpower and equipment.

seeking carpet cleaning and deodorizing, he stated the company was "getting away from carpets" and referred the caller to a Calloway competitor. To a caller on September 13 who was asking why she hadn't yet heard back from Calloway about a mold sample, he first told the caller that Calloway probably hadn't gotten back to her because "they don't know what they're doing," stating that the referenced workers "are no longer working here," before again referring the customer to a competitor. Burer also made statements that Calloway's workers were "terrible employees" and "really inexperienced."

### 3. Diverted Business in September and October 2021

Calloway seeks compensation for "diverted business opportunities" during September and October 2021, a damage figure that Calloway calculates at $15,344.40. But Calloway presented little evidence that the handful of calls between September 1 and September 13, or any other work performed by Burer or 1 Call Away in September or October 2021, resulted in diverted work or a loss of earnings for Calloway.[21] For example, Ms. Calloway testified that most of Calloway's business was repeat business. But there was no evidence that any existing Calloway customers were likely to have been confused or misled by Burer that 1 Call Away was Calloway. The sole evidence of confusion that Calloway presented was the handful of recordings between Burer and prospective new customers who dialed Calloway's "emergency" number and were routed to Burer's cell.

Calloway's evidence suggested that its concerns were less about trademark violations than what Ms. Calloway perceived as unfair "poaching" of Calloway's customers. (See also Doc. 1, ¶40, alleging that Defendants contacted Calloway's "three

---

[21]Although Defendants failed to provide adequate business records, Calloway failed to provide other evidence that the callers ultimately hired 1 Call Away to perform the work. Nor did Calloway present evidence of a decline in its earnings or profits during September and October 2021.

largest customers (whose combined business is worth $500,000 annually…), disparaged Calloway to each of those customers, and solicited the customers' business….")). But the only evidence presented at trial that concerned repeat business was that pertaining to a customer identified as BMS Cat. And that evidence did not reveal any deceptive practice, trademark violation, or other wrongdoing by Burer.

BMS Cat is a larger restoration company that employs subcontractors like Calloway to perform discrete projects. Mike Bowman of BMS Cat testified that BMS Cat had worked with Calloway for several years when it entered into a new subcontract with Calloway to remediate flood damage at an Embassy Suites hotel in Northern Kentucky. Because the old ballroom carpet in that hotel needed to be torn out and permanent carpet would not be delivered for months, BMS Cat separated the contract into phases. At the time (June 2021), Burer was BMS Cat's primary contact for Calloway. Bowman testified he was impressed by Burer and with the work that he and his crew performed. Calloway completed that initial phase of work when it installed temporary carpet shortly before Burer's departure.[22]

In September 2021, Burer informed Bowman that he had left Calloway, but would like to work on the final phase of the Embassy Suites project. Bowman, who explained that he had very little prior interaction with Ms. Calloway, readily agreed to hire Burer's new company. Bowman based his decision solely on his familiarity with and favorable impression of Burer rather than any dislike of Calloway.[23] He asked Burer for paperwork

---

[22]Ms. Calloway's testimony that Calloway had a contract for the final phase of work, involving the installation of permanent carpet, was not credible. In addition to contrary testimony by Bowman, the invoice that Calloway offered was dated August 17, 2021 for "carpet, freight, and underlay per Bobby [Burer]" - corresponding with the installation of temporary carpet during the first phase.

[23]Bowman testified that the quality of the work that Burer performed was exemplary. Although Calloway failed to present any evidence of existing customer confusion, or of diminishment of the value of its

documenting his new business name and tax identification number, which Burer provided on September 30, 2021. Burer identified the new business as "BB Investment Properties doing business as 1 Call Away Restoration," but Bowman fully understood it to be an entirely separate entity from Calloway. In short, Burer's solicitation of new business from BMS Cat reflects no wrongdoing by Burer.

Returning to the issue of the diverted calls, Robbins did testify to a loss that flowed from one call by a prospective customer identified as Sean Fox. Calloway did not submit a recording of the Fox call but submitted email correspondence that purported to document a call on September 12, 2021. In the email, Calloway states that Burer provided "false information" that Calloway was no longer performing water restoration and referred Fox to Brock Restoration.[24] But at the time that Robbins first contacted Fox as part of her follow-up from the period of diverted calls, Fox complained about the quality of the work that had been performed. Assuming (erroneously) that Burer may have performed the work and sullied Calloway's reputation in doing so, Robbins instructed a crew to re-do the Fox job, for which it billed Fox $3,278.34. Soon thereafter, the truth came out that Fox had never hired Burer but instead had hired Brock Restoration, whose bill Fox had already paid. Calloway later refunded Fox the $3,278,34, never receiving compensation for the remedial work it inadvertently performed on Brock Restoration's behalf.

Calloway also offered testimony about diverted calls from the unhappy Mr. Shriver, whose Calloway jobsite Burer left incomplete on August 27, 2021. Calloway recovered

---

trademark through substandard work performed by Burer under the 1 Call Away name, Bowman's testimony on this point arguably undermines any claim of dilution or tarnishment under the Lanham Act.
[24]The Court recognizes that this email provides but one example of a significant amount of hearsay admitted throughout the trial without objection.

nothing from Mr. Shriver, who had to pay another company to complete the work after Burer's departure.

The Court finds the evidence of the Fox and Shriver jobs to be persuasive evidence of "diverted business opportunities" in September and October of 2021, but insufficient to justify $15,344.40 in claimed damages. (*See* PX33). Only the Fox job relates to a defined loss of $3,278.34 for work performed on behalf of Fox/Brock Restoration. Because there was no evidence that any other diverted call resulted in work to Burer or a loss to Calloway,[25] the remaining sum of $12,066.06 is presumed to represent the unbilled invoice for the Shriver job.

An invoice is not profit; Calloway would have had to pay for labor and materials had it performed the Shriver job. Although Calloway presented no direct evidence of its profit margin,[26] Bowman of BMS Cat testified that a "standard" industry markup was 20%. The Court therefore finds that Calloway suffered a loss of $2,413.21 for the Shriver job, or 20% of the presumed $12,066.06 Shriver invoice. Adding the Shriver job loss of $2,413.21 to the Fox job loss of $3,278.34 yields a total of $5,691.55 in "diverted business opportunities" damages.

### 4. The Unpaid Wage Claim

---

[25]Calloway's failure to prove monetary gain by Burer or loss to itself from other diverted calls does not mean that Calloway recovers nothing for those calls. As discussed below, because Burer defamed Calloway on two calls, Calloway is entitled to recover damages for that defamation, along with punitive damages and attorney fees.

[26]Calloway presented no evidence at all concerning its own financial statements or tax records, leaving the Court to speculate whether its profits went up, down, or stayed the same after Burer's departure.

After Burer left, he sought to recover unpaid wages. Burer testified that from December 2020 through his departure in August 2021, he consistently worked 120-130 hours per week for Calloway, for which he should have been paid overtime. Burer also maintained that he was owed $3,000.00 per week, meaning that the weeks in which he was paid only $2,000.00 represented a shortfall. But Ms. Calloway testified that Burer routinely worked only 40 hours, with rare exceptions, and that she paid $1,000.00 bonuses in addition to his $2,000.00 weekly wage solely in her discretion.

Burer retained counsel to pursue his wage claims. On November 4, 2021, his attorney emailed a letter demanding $39,000 in unpaid wages.[27] On November 23, 2021, new counsel sent a second letter that similarly sought $39,000 in past due wages.[28] At some point Burer filed a Department of Labor ("DOL") claim. Ms. Calloway complains that Burer contacted former employees[29] seeking to fraudulently enlarge the DOL investigation.[30]

In this case, Calloway seeks reimbursement of $3,850 in attorney fees that it spent defending the wage claim. But the Court finds no basis for such an award. It was evident at trial that Burer believed that he was entitled to past wages – as did two separate attorneys retained to pursue the claim. Because the Court does not find the wage claim to be wholly meritless or frivolous, Calloway is not entitled to recover its defense costs.

---

[27]Calloway pointed out that the November 4 letter from Burer's attorney corresponds with the date of Facebook Messenger exchanges between Burer and Ms. Calloway. However, the Court does not view the Messenger texts to be related to the wage claim.

[28]The second letter bases Burer's wage claim on unreimbursed travel/food expenses for September 2020 work in Florida, for hours that Burer worked in 2020 prior to being placed on the payroll, and for "wage issues" between January and August 2021.

[29]Given Ms. Calloway's testimony about the employees' strong dislike of Burer and the fact that he fired many of them, the Court assumes the employees may have been less than receptive to Burer's outreach.

[30]According to Ms. Calloway, Burer deliberately withheld the employees' last checks as GM and later tried to enlarge the DOL claim based on the missing checks he had withheld. However, Ms. Calloway testified that she quickly discovered his misconduct and re-issued the checks, leaving the employees full paid.

**5.  November 2021 Messenger Texts and Disparaging Facebook Post**

On November 4, 2021 at 10:44 a.m., Ms. Calloway contacted Burer via Facebook Messenger, texting him: "[S]top calling my jobs and just stay in your lane!!" She accuses Burer of "name calling and badmouthing" and of stealing a "moisture meter and cameras." The same text accuses Burer of getting "jobs by taking my leads I paid for and calling my jobs and contacts." Presumably in response,[31] Burer wrote "Don't get in a pissing match with a SKUNK," but also wrote "[w]e need to stop this kind of bs--- I want to buy your company now Paul is gone I'll buy you [out] today." Burer also suggests that his offer is "a wonderful opportunity for you." The next text reads: "The sooner you get out of the kitchen the sooner the heat [lets] up."

Less than a week later, on November 10, 2021, Burer published the following post on his Facebook ("FB") account:

> 1 Call Away Restoration, I'm getting an influx of DISSATISFIED calloway cleaning and restoration customers and others, I am finishing their jobs as a courtesy, if you are experiencing this same thing please call me I will finish your jobs for you, PLEASE call me at 513-520-9924

(PX 15).[32]

The Court finds no credible evidence that the November 10 FB post was true when published. Instead, Burer appears to have published the post out of spite based on Ms. Calloway's request that he stop contacting Calloway's customers. Burer testified that he received 4-5 calls over a two-day period after the post, but was equivocal on whether he performed any work as a result.

---

[31]The exhibit filed of record appears incomplete insofar as it contains date and time stamps for only some of the messages. (*See* PX 13).
[32]No evidence was presented concerning whether Burer's FB account was public or private, how many FB "friends" Burer has, or the extent to which the post itself was otherwise disseminated or visible.

### 6. Burer's Alleged Profits After Departing Calloway

Calloway asserts that after his departure, Burer's wrongful conduct earned him profits totaling $298,085.00. But the Court finds insufficient evidence to show any such "profits." When Calloway's counsel sent Burer a "cease-and-desist" letter concerning his company name and infringing imagery in January 2022,[33] Burer promptly changed his business name to "Emergency Response Restoration LLC" ("Emergency Response"). He registered the new entity with the State of Ohio on January 19, 2022 and opened a new bank account in its name on January 25, 2022. At the same time, he took down the 1 Call Away website and quit accepting new business under the name of 1 Call Away.

Apart from its failure to prove any likely or actual damages from the use of the 1 Call Away name or Calloway's imagery on 1 Call Away's website, Calloway's evidence of "profits" suffers from a significant timing problem. Calloway calculates the alleged "profits" based on an analysis of cash debits and withdrawals made payable to Burer from the accounts of 1 Call Away and Emergency Response over a thirteen month period beginning on February 1, 2022 (just *after* Burer took down the offending website and established Emergency Response) and ending on March 31, 2023. (*See* PX32).[34] In other words, Calloway seeks Defendants' "profits" for a 13-month time period that entirely *post-dates* Burer's wrongful acts as found by the Court.

Based on the evidence presented, the Court finds no damages sustained by Calloway, or ill-gained profits by Defendants, based on any conduct after January 31,

---

[33]The precise date of the cease-and-desist letter is not in evidence, but there were several allusions to January 2022, corresponding with the time frame in which this lawsuit was filed.

[34]PX32 reflects a summary of debits from the accounts of both 1 Call Away and Emergency Response Restoration, LLC. The exhibit was not authenticated by any accountant or similar professional. However, the underlying banking records were authenticated and Defendant Burer voiced no objection.

2022. The earliest misdirected call entered into evidence was September 1, 2021. Burer set up 1 Call Away and its website in mid to late September 2021, and established 1 Call Away's bank account on October 5, 2021. And Burer published his disparaging Facebook post about Calloway on November 10, 2021. By January 31, 2022, shortly after receiving a "cease-and-desist" letter from Calloway's counsel, Burer had discontinued soliciting new business under the name of 1 Call Away and had rebranded his business as Emergency Response. There was no credible evidence that Burer persisted in either Lanham Act violations or other wrongful conduct after January 2022.

Calloway did present limited evidence that the name "1 Call Away" remained in nominal use after January 31, 2022, on the bank account established on October 5, 2021 under the name of "BB Investment Properties, LLC DBA 1 Call Away Restoration." But Calloway offered no evidence that the deposits placed into the account after January 31, 2022, or debits drawn from that account after January 31, 2022, were related to Lanham Act violations or to any other claim in this case.[35] The only relevant evidence that Calloway offered was that some deposits represented payments by BMS Cat to BB Investment Properties and/or 1 Call Away.[36] But as explained, neither Defendants' initial work for

---

[35]Under 15 U.S. C. §1117(a), a plaintiff can recover profits solely by proving defendant's sales, leaving the defendant to rebut the presumption that sales equal profits. Here, Calloway chose to attempt to prove profits based not on 1 Call Away's sales, but on "debits" that *post-dated* any Lanham Act violations. Although Calloway was certainly hampered by Defendants' failure to produce discoverable business records, Calloway still had access to 1 Call Away's banking records beginning on October 5, 2021 (the date Burer established the account) through January 31, 2022. Yet Calloway elected not to provide <u>any</u> analysis of 1 Call Away's records for that critical time period.

[36]Calloway offered into evidence a check register from BMS Cat that reflects multiple payments to "BB Investment Properties LLC DBA 1 Callaway [sic] Restoration," including a $45,000 payment made to BB Investment Properties on January 13, 2022 that corresponds with the installation of permanent carpet at the Embassy Suites (of which no more than 20% reflected profit per the testimony of Mr. Bowman). Invoices sent to BMS Cat between January 31, 2022 and March 2023 similarly reflect Burer's continued use of the "1 Call Away" entity name for BMS Cat. As detailed above, BMS Cat made the conscious decision to proceed with Mr. Burer's new company and there was no name confusion. At some point in 2023, BMS Cat severed its relationship with Burer due to issues unrelated to this case. BMS Cat has since sought to reestablish its relationship with Calloway.

BMS Cat, nor Burer's continued use of 1 Call Away for bills sent to BMS Cat, reflect any harm to Calloway caused by Burer.

In addition to the mismatched timing between Calloway's claim for "profits" and the period of Defendants' wrongdoing, Calloway's calculation relies in part on bank records from Emergency Response. But Calloway did not allege that Emergency Response infringed upon its trademark, and failed to offer any evidentiary basis for holding that non-party to this lawsuit liable on the claims asserted.

Calloway also failed to prove by a preponderance of the evidence that all debits made payable to Burer from 1 Call Away's account should be characterized as "profits." Burer testified that he often paid subcontractors who performed work for him in cash, providing some evidence that the debits might not represent "profits." But even if Calloway had proved that the debits occurred during the relevant time period and limited its analysis to 1 Call Away's account, and even if this Court were to accept Calloway's speculative hypothesis that all debits reflect "profits," a legal analysis of the equities still would not favor Calloway's accounting, as discussed below.

### III. Conclusions of Law: Proof of Damages by Claim

Despite the entry of default, a final default judgment cannot be entered in the absence of proof of damages. "Once a default is entered against a defendant, that party is deemed to have admitted all of the well pleaded allegations in the complaint, except those relating to damages." *Microsoft Corp. v. McGee*, 490 F. Supp. 2d 874, 878 (S.D. Ohio 2007) (citing *Antoine v. Atlas Turner, Inc.*, 66 F.3d 105, 110-11 (6th Cir. 1995)).[37] In

---

[37]Only "well pleaded" factual allegations from the complaint are admitted. At times, and notwithstanding the entry of default, Plaintiff's presentation of evidence seemed to focus as much on the elements of the claim asserted as on damages. That is somewhat understandable to the extent that some damages necessarily depended on overlapping proof of the underlying claim. When the proof at trial contradicted the factual

addition to its duty to prove damages, Calloway may not obtain a duplicate recovery even if the same damages are recoverable under multiple theories. It is also worth noting that Calloway did not assert all claims for damages against both Defendants.[38] (*See* PX33 (breaking down damages sought against Burer versus damages sought against both Defendants)).

### A. Deceptive Trade Practices Under Ohio Law

Calloway seeks relief for Burer and 1 Call Away's deceptive trade practices under Ohio R.C. § 4165.01 *et seq*. (*See* Doc. 1, Counts 1 & 2). Burer and 1 Call Away engaged in deceptive trade practices when Burer answered misdirected telephone calls through September 13, 2021, referred some potential customers to competitors, deliberately chose a business name that evoked Calloway's trademark, and knowingly used Calloway's imagery on 1 Call Away's website. *See* O.R.C. §§4165.02(A)(1)-(3) and (10).[39] However, Calloway failed to prove any monetary damages relating to this claim apart from diverted business opportunities from the Fox and Shriver jobs in September and October 2021, totaling $5,691.55.

Calloway submitted no documentary evidence or testimony that it suffered a loss of good will or reputational damage. Although Calloway rightfully complained about

---

allegations of the complaint (for example, concerning the value of equipment taken or the amount of gift cards), the Court accepted the proof of damages offered at trial.

[38]In the Memorandum Opinion and Order granting in part Plaintiff's motion for additional sanctions against Defendant Burer, the Court previously stated that "[w]ith the additional entry of default against Defendant Burer concerning his underlying liability, the only issue remaining is damages. Once that issue has been resolved, the Court will enter a final default judgment against both Defendants, *who remain jointly and severally liable on all claims asserted*." (Doc. 59 at 8, PageID 781 (emphasis added)). In hindsight, the Court regrets its ambiguous phrasing. Even in its initial complaint, Plaintiff did not assert joint and several liability for all claims against both Defendants. At trial, Plaintiff clearly asserted joint liability only as to two of its damage claims. (*See* PX33, asserting joint liability only for lost profits and diverted business opportunities).

[39]Calloway's complaint alleges that Burer misappropriated Calloway's customer lists and other confidential and proprietary information, as well as trade secrets. However, Calloway presented no evidence of damage from the alleged use of any such customer lists or similar proprietary information.

Defendants' failure to produce all relevant business records, Calloway had access to its own profit and loss statements, tax records, and other business records that it could have used to show any damages sustained immediately after Burer's departure. Calloway also presented no evidence of how often the 1 Call Away website was viewed by potential customers (if at all), or whether Calloway maintained its own website.[40] Regarding the phone call leads through September 13, Calloway presented no evidence on: (1) the total number of calls/prospective leads; (2) the average size of requested jobs or expected profit margin; or (3) what percentage of calls for estimates (leads) translate to contracted work. In the absence of *any* evidence to suggest any loss at all, much less evidence that could quantify that loss, Calloway's evidence of damages was entirely speculative (beyond the misdirected Fox job and abandoned Shriver job). In sum, Calloway has proved its entitlement only to $5,691.55 in compensatory damages on the Ohio deceptive practices claim. Although Calloway also seeks punitive damages and attorney fees for this claim, the Court finds neither award to be appropriate, for the same reasons that it concludes those damages to be inappropriate under the Lanham Act.

### B. Lanham Act Claims

Primarily based on the infringement of its trademark and misuse of its imagery, Calloway seeks injunctive relief and damages under the Lanham Act. (*See* Counts 3 and 4). Under 15 U.S.C. §1117(a), a plaintiff who establishes a Lanham Act violation that is likely to cause confusion, or that is likely to deceive "shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the

---

[40]Calloway's witnesses testified that the bulk of its advertising was through print media and televised commercials.

costs of the action." *Id*.; *see also* 15 U.S.C. § 1125(a). In addition to seeking relief for violations of 15 U.S.C. § 1125(a), Calloway alleges that Burer's infringement was "likely to cause dilution by blurring or by tarnishment" of Calloway's mark. (*See* Doc. 1 at ¶¶ 56, 63, citing 15 U.S.C. § 1125(c)(1)).

### 1. Recovery of Profits or other Damages

In *Max Rack, Inc. v. Core Health & Fitness, LLC*, 40 F.4th 454 (6th Cir. 2022), *reh'g denied*, No. 20-3598, 2022 WL 3237492 (6th Cir. Aug. 10, 2022), the Sixth Circuit discussed the type of profits or other damages that are recoverable under the Lanham Act:

> A trademark owner might seek to recover profits that it has lost because a competitor used an infringing mark to poach sales to customers. *See Balance Dynamics*, 204 F.3d at 690-91; 5 McCarthy, *supra*, § 30:79. If a holdover licensee continues to use a mark, the trademark owner might also seek the royalties that it would have earned on the licensee's illicit sales under the licensing agreement. *See La Quinta*, 603 F.3d at 341 & n.10; 5 McCarthy, *supra*, § 30:86. Apart from these "lost profits," a trademark owner might further seek to recover for the "lost goodwill" that arose when consumers bought the infringer's inferior product and soured on the owner's brand as a result. *Balance Dynamics*, 204 F.3d at 690–91. Or a trademark owner might seek to recover the "damage control costs" that it incurred to reduce the harm from the infringer's conduct - say, by spending money on advertisements clarifying that the owner has no affiliation with the infringer. *See id.* at 691-92.

*Id.*, 40 F.4th at 475.

Once again, Calloway presented no clear evidence of *any* actual injuries that it suffered based on the Lanham Act violations beyond the $5691.55 in diverted business opportunities already awarded based on proof of deceptive trade practices under Ohio law. "[D]amages are not permitted which are remote and speculative in nature." *Broan Mfg. Co., Inc. v. Associated Distributors, Inc.*, 923 F.2d 1232, 1235 (6th Cir. 1991) (internal quotation marks and citation omitted). As explained, the evidence regarding

Defendants' "profits" was generally unconvincing for multiple reasons, including the lack of any wrongdoing by either Defendant during the period for which the alleged "profits" were sought (February 2022 through March 2023).

In any event, an accounting of profits under the Lanham Act is an equitable award, not an award of right. *La Bamba Licensing, LLC v. La Bamba Authentic Mexican Cuisine, Inc.*, 75 F.4th 607, 611 (6th Cir. 2023). "[A]s an initial matter, 'a plaintiff likely must show some connection between the identified 'sales' and the alleged infringement.'" *House v. Player's Dugout, Inc.*, No. 22-5843, 2024 WL 495998, at *7 (6th Cir. Feb. 8, 2024) (quoting *Max Rack*, 40 F.4th at 472). Here, Calloway's failure to demonstrate actual confusion between its mark and 1 Call Away's name and brief use of Calloway imagery from 1 Calloway's website serves as a further basis to deny lost profits.[41] "Before awarding 'marketplace' damages like lost profits,… courts generally require a plaintiff to show that an infringing mark has *actually* confused some consumers about the mark's affiliation with the [plaintiff]… (not just that it is *likely* to do so)." *Max Rack, Inc.*, 40 F.4th at 375 (emphasis original, additional citations omitted).

Despite Calloway's inability to recover lost profits for Defendants' trademark violations, the Lanham Act does offer the possibility of statutory damages. *See Microsoft Corp. v. McGee*, 490 F.Supp.2d at 882 (holding statutory damages are appropriate in cases involving default where the information needed to prove actual damages is within the infringers' control and is not disclosed, collecting cases). Here, Burer failed to produce some key records but not all of the information required to prove Calloway's damages was within Burer's control. *See infra*, at 15 n.24 and at 20-21. Still, it is undisputed that

---

[41] For similar reasons, Calloway is not entitled to treble damages.

Burer attempted to unfairly jump-start his competing business by choosing a name reminiscent of Calloway's slogan, and by using Calloway's imagery on his website. Considering the evidence and equities presented, the Court finds an additional statutory award of $10,000.00 to be appropriate compensation for the Lanham Act violations.

### 2. Punitive Damages

Calloway also seeks punitive damages for Burer's deceptive practices and Lanham Act violations. However, punitive damages are not available under *either* the Lanham Act or the Ohio Deceptive Trade Practices Act. See *La Quinta Corp. v. Heartland Properties LLC*, 603 F.3d at 342; *Kremer v. Reddit, Inc.*, No. 2:21-CV-00038, 2022 WL 4241273, at *2 (M.D. Tenn. Sept. 14, 2022); *Frisch's Restaurant, Inc. v. Elby's Big Boy of Steubenville, Inc.*, 661 F.Supp. 971, 992 (S.D. Ohio 1987).

### 3. Attorney Fees Under Lanham Act

Finally, Calloway seeks its attorney fees as "costs." The Lanham Act permits an award of attorney fees, but only in "exceptional cases." 15 U.S.C. § 1117(a). The award of attorney fees under Ohio's Deceptive Trade Practices Act is also discretionary. *See* Ohio R.C. § 4165.03 ("An award of attorney's fees may be assessed against a defendant if the court finds that the defendant has willfully engaged in a trade practice listed in division (A) of section 4165.02 of the Revised Code knowing it to be deceptive."). Notwithstanding Burer's intentional and wrongful conduct in answering the diverted phone calls and establishing 1 Call Away, the Court declines to award attorney fees.

The Supreme Court has defined an "exceptional" Lanham Act case as "one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the

unreasonable manner in which the case was litigated." *Octane Fitness, LLC*, 134 S.Ct. at 1756, 572 U.S. at 554. In *Max Rack, Inc., LLC*, 40 F.4th at 478, the Sixth Circuit similarly considered what might qualify as an "exceptional" case under the Lanham Act:

> The plaintiff might have an unusually strong (or unusually weak) case on the merits. Blatant trademark infringement might justify an award for the plaintiff, whereas a frivolous infringement claim might justify one for the defendant. Or the losing party might have litigated the case in an unreasonable manner - for example, by requesting costly discovery to coerce a settlement despite the weakness of its claims.

*Id.*, 40 F.4th at 478 (internal citations omitted). "In the end, …the statute leaves it for the district court to decide under the totality of the circumstances whether the case before it has the 'rare' qualities that distinguish it from a typical case." *Id.* (citing *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S.Ct. 1749, 1756, 572 U.S. 545, 554 (2014).

Sixth Circuit case law emphasizes that there is no "bright-line rule" to guide a trial court's evaluation. *See La Bamba Licensing, LLC*, 75 F.4th at 614. A court must consider not only a non-exhaustive list of factors, but that each factor may carry different weight depending on the facts presented. *Id.*, at 610-611 (holding that the trial court erred by treating the number of factors in favor of fees versus the number of factors in opposition to a fee award as "a math problem"). Considering the totality of the circumstances here, the Court finds nothing "exceptional" sufficient to support an award of attorney fees.

No doubt Calloway will protest. After all, this Court has previously ruled that Defendants' conduct during the discovery process was reprehensible and in bad faith – one factor that could support such an award. But the Court declines to punish the Defendants twice for the same conduct. In prior orders, the Court already punished Defendants by awarding attorney fees totaling $19,001 and entering a default against both Defendants. (*See* Doc. 41 (awarding $10,216.00 in fees), and Doc. 59, p. 10 at

PageID 783 (awarding an additional $8,785 in fees)). The Court also dismissed Burer's counterclaims and entered adverse evidentiary rulings. *Id*. And the Court refused to reopen discovery or move the trial date for prospective new counsel, causing Burer to proceed pro se at trial - to his clear disadvantage.

Another factor the Court considers is the strength of Calloway's trademark claims. A comparison of the marks reveals enough similarity between "Calloway Cleaning & Restoration, Help is just a call-o-way" and "1 Call Away" to suggest *some possibility* of confusion. But Calloway's trademark consists of solely of a "word mark" or design using the following words: "CALLOWAY CLEANING & RESTORATION HELP IS JUST A CALL-O-WAY." As stated on the trademark registration:

> Color is not claimed as a feature of the mark. The mark consists of the literal element "CALLOWAY CLEANING & RESTORATION HELP IS JUST A CALL-O-WAY," with an inverted swoosh in between the wording "HELP IS JUST A CALL-O-WAY," AND "CALLOWAY CLEANING & RESTORATION".

(PX 1). On the visual depiction of the mark on Calloway's trademark application, the words "Help is just a call-o-way" appear in much smaller font size just above the "swoosh," in stark contrast to the much larger font and capitalized CALLOWAY company name.

Despite the similarity of the name "1 Call Away Restoration" to the tagline portion of Calloway's mark, Calloway's trademark claim is not unusually strong. Calloway offered testimony about Calloway's consistent use of its design/word mark. The main evidence of Burer's infringement (besides the similarity of name) was an archival view of the website of "1 Call Away Restoration" dated November 24, 2021. But on that website, the font, text and design of "1 Call Away Restoration" is quite distinctive, with the word "ONE" spelled out and a "1" placed inside the "O." The lettering of "One [1] Call Away" is arranged

in a blue square with no "swoosh," in a manner that is readily distinguishable from Calloway's trademark in multiple ways. (PX 17). Calloway offered no evidence that Burer advertised 1 Call Away beyond the brief existence of a website and Burer's single Facebook post. Calloway's witnesses testified that, in contrast, Calloway spends more than $200,000 per year displaying its distinctive word mark in print media such as *Reach* magazine, television commercials, and sponsorship of public events. The takeaway is that Calloway operated as the giant Goliath in the advertising market. But unlike Goliath's biblical foe, 1 Call Away wielded no powerful slingshot. Instead, 1 Call Away was a blip of an upstart that does not appear to have advertised its name to the public in any meaningful way. Therefore, this factor does not favor an award of fees.

The main factor that favors an award of fees is Burer's "willfulness" and/or intent to deceive. In *La Bamba*, the court instructed that "willfulness" bears on the "intent to deceive" factor and perhaps on the factor of the "public interest in making the misconduct unprofitable." *Id.*, 75 F.4th at 611. In addition to continuing to answer diverted calls from Calloway's emergency line for nearly three weeks, Burer selected a business name evocative of Calloway's slogan. But "willfulness" in the context of a Lanham Act violation also considers whether the infringement continued after the violator was put on notice of the infringement. Here, Burer did not persist in the alleged infringing conduct after receiving the cease-and-desist letter, but immediately took down the website and took prompt affirmative steps to rename and rebrand his competing business in a manner that did not infringe upon Calloway's mark. *Contrast Coach v. Goodfellow*, 717 F.3d 498, 505-06 (6th Cir. 2013) (defendant who did not challenge his liability exhibited "willful blindness" when he allowed vendors at flea market to continue selling counterfeit products long after

receiving notice of the infringement); *accord La Bamba*, *supra* (restaurant owner elected to wait more than a year and a half after receiving a cease-and-desist letter before changing the infringing name).

The timing of Calloway's cease-and-desist letter to Burer and 1 Call Away also weighs slightly against the award of fees. Calloway became aware of Burer's deceptive practices and potential infringement within a couple of weeks of his departure. Though a small business, Calloway was sophisticated and well-established, spending in excess of $200,000.00 per year on advertising and marketing. Despite that sophistication, Calloway did not present evidence that it routinely displayed its mark with the letter R enclosed with a circle or any other obvious notice of registration. *See* 15 U.S.C. § 1111. In other words, Burer does not appear to have had actual notice that Calloway had registered its trademark prior to the cease-and-desist letter. *See id.* ("[I]n any suit for infringement under this chapter by such a registrant failing to give such notice of registration, no profits and no damages shall be recovered under the provisions of this chapter unless the defendant had actual notice of the registration."). During the period of infringement, Calloway quickly marshaled legal counsel to defend against Burer's claims for unpaid wages and to challenge his claim for unemployment benefits. Yet Calloway waited months before it sent the cease-and-desist letter that alerted Burer to its position that his new business name and website infringed upon Calloway's mark.[42]

The Sixth Circuit has rejected the notion that fees must be automatically awarded solely on the basis of the intent to deceive or any other factor. *See La Bamba Licensing,*

---

[42]Ms. Calloway offered evidence of a FB Messenger text on November 4, 2021, a date by which time the misdirected calls had been redirected back to Calloway. In context, the Court interprets that text as focusing on Burer's solicitation of Calloway's prior customers, the only identified one of which was BMS Cat, as opposed to any Lanham Act violations.

*LLC*, 75 F.4th at 614. Of course, there is a public interest in making Burer's conduct and brief period of "palming off" unprofitable. But on the record presented, there was little to no evidence that Burer made *any* profit from his deceptive trade practices and Lanham Act violations between August 27, 2021 and January 31, 2022.[43] And many factors – including but not limited to Ms. Calloway's often inconsistent and vague testimony, the differences between Calloway's mark and the manner in which 1 Call Away displayed its name, as well as the lack of evidence of any actual damage to Calloway – all weigh against an award of fees under the Lanham Act.

### C. Tortious Interference Claims Under Ohio Law

In Count 5, Calloway seeks compensatory and punitive damages based on Burer and 1 Call Away's tortious interference with Calloway's contractual and/or business relationships. The proof on this claim included: (1) the Fox and Shriver jobs; (2) false statements made during the brief period of misdirected phone calls about Calloway's ability to perform certain work; and (3) the November Facebook post disparaging Calloway's work. For the reasons stated, Calloway failed to prove damages beyond the lost opportunity damages for the Fox and Shriver jobs.

As for punitive damages on this claim, at least one Ohio court has held that it would be improper to award punitive damages for tortious interference with a contract or business relationship. *Becker Equip., Inc. v. Flynn*, 2004-Ohio-1190, ¶ 15, 2004 WL 486219, at *3 (Ohio App. 12 Dist. March 15, 2004) (holding that Ohio does not permit an award of punitive damages or attorney fees for tortious interference with a contract or

---

[43]The nature of the misdirected phone calls (some of which Burer referred to competitors) suggested little profit to Burer even assuming that Burer successfully bid on any jobs. There was no evidence that any prospective customer to whom Burer provided a bid proceeded to hire 1 Call Away based on any confusion by or similarity of 1 Call Away's name to Calloway's trademark.

business relationship); *but see Von Stein v. Phenicie*, 2014 -Ohio- 4872, ¶ 66, 2014 WL 5510473, at *16 (Ohio App. 3 Dist., 2014) (affirming award of punitive damages based on malicious conduct that occurred during tortious interference, without discussion of the propriety of such damages for those claims). Even if Ohio law could support a punitive award for tortious interference, the Court exercises its discretion not to make such an award here. *See also, generally, Becker Equip*., 2004-Ohio-1190, ¶12 (declining to award punitive damages or attorney fees for alleged misappropriation of trade secrets where plaintiff sustained little or no damage as a result of the alleged misconduct).

### D. Conversion of Calloway Property

In Count 6, Calloway seeks compensatory damages for Burer's alleged conversion of "approximately $54,899 of cleaning and restoration equipment and $3,000 in gift cards." (Doc. 1, ¶75). Based on the Court's Findings of Fact, Calloway is entitled to recover compensatory damages on its conversion claim in the sum of $15,122.64, representing the value of the gift cards ($1,500.00) and the Iowa furniture ($4,036.15), and the replacement value of equipment taken on August 27, 2021 ($9,586.49). Although Calloway also seeks punitive damages on this claim, the Court concludes that Calloway's evidence on its conversion claims falls short of the clear and convincing evidence of malice and bad faith required to support such an award under Ohio law.

### E. Defamation

In Count 7, Calloway seeks both compensatory and punitive damages, as well as attorney fees, for defamation based in part on the November 10, 2021 Facebook post.[44]

---

[44]Plaintiff also more generally alleges in its complaint that Defendants defamed Calloway when they "contacted Calloway's largest customers and …disparaged Calloway to those customers." (Doc. 1, ¶82). However, no evidence was presented to support damages in connection with this vague allegation.

The FB post constitutes business defamation *per se* under Ohio law. Though not specifically alleged in the complaint, Calloway also proved at trial that Burer verbally slandered or defamed Calloway in statements to prospective customers during at least two diverted telephone calls. Burer made the false statements with actual knowledge of their falsity or with reckless disregard of their probable falsity – in short, the Court finds "actual malice."[45] When defamation is *per se* and the defendant made the statement with knowledge of its falsity, "[p]roof of the defamation itself establishe[s] the existence of some damages." *Gosden v. Louis*, 116 Ohio App.3d 195, 208, 687 N.E.2d 481, 489 (9th Dist.1996) (additional citations omitted).

Still, the amount of damages remains difficult to ascertain based on the evidence presented. There was little evidence that any potential Calloway customer saw the FB post but for Burer's own testimony that he received 4-5 calls about the post. Calloway offered no evidence concerning any impact on its reputation, suggesting such impact was nominal at most. Considering some level of "presumed" compensatory damages for defamation per se under Ohio law, the Court awards $10,000 to compensate Calloway for this claim.

In addition, and in contrast to other claims for which Calloway seeks punitive damages, the Court finds sufficient proof to award punitive damages. Punitive damages are always discretionary; they *may* be awarded under Ohio law for tort actions that involve fraud, actual malice, or insult. *See Preston v. Murty,* 32 Ohio St.3d 334, 512 N.E.2d 1174,

---

[45]When the defamed party is a private figure in a matter of public concern, proof of defamation requires only negligence, not actual malice in publication. *See Gibson Bros., Inc. v. Oberlin College*, 187 N.E.3d 629, 653, 2022 -Ohio- 1079, ¶ 85 (Ohio App. 9 Dist., 2022). On the record presented, the Court finds that Defendant Burer published the FB post with actual malice.

1175 (1987). The purpose of punitive damages is not to compensate Calloway as Plaintiff, but to punish Defendants and to deter them and others from committing similar acts in the future. *See Brandt v. Pompa*, 220 N.E.3d 703, 716, 171 Ohio St.3d 693, 706 (Ohio 2022). In order to recover under Ohio law, Calloway generally must prove both that Burer acted with "malice" <u>and</u> some level of compensatory damages. Ohio R.C. 2315.21(C). Calloway also must establish its entitlement to punitive damages by clear and convincing proof. R.C. § 2315.21(D)(4). Here, Calloway has produced clear and convincing evidence of actual malice based on Burer's conduct in committing the tort of defamation.[46] But even when a plaintiff is entitled to punitive damages, Ohio caps such awards at a maximum of two times the amount of compensatory damages. *See* Ohio R. C. § 2315.21(D)(2)(a) and (b) (capping punitive damages against an individual at the lesser of two times the amount of compensatory damages or ten percent of the individual's net worth when the tort was committed). In light of the compensatory damage award of $10,000, the Court finds the sum of $20,000 in punitive damages to represent just and fair punishment.[47]

Finally, the Court considers the issue of attorney fees for the defamation claim. In *Cruz v. English Nanny & Governess School*, 207 N.E.3d 742, 749, 169 Ohio St.3d 716, 724 (2022), the Ohio Supreme Court confirmed that Ohio adheres to the "the 'American rule' with respect to recovery of attorney fees: a prevailing party in a civil action may not recover attorney fees as a part of the costs of litigation." Only three exceptions apply: "(1) when a statute creates a duty to pay attorney fees, (2) when the losing party acted in bad

---

[46]Calloway suggested that *all* of Burer's tortious conduct was motivated by actual malice, or a spirit of revenge against his former paramour and the business she owned, based on Ms. Calloway's refusal to give Burer an ownership interest. However, the Court does not find clear and convincing evidence of "actual malice" for any claim other than defamation.

[47]In the absence of contrary evidence, the Court assumes that this sum is not more than 10% of Burer's total net worth.

faith, and (3) when the parties contracted to shift the fees." *Id.* (citation omitted). Here, Plaintiff seeks fees for defamation under the second exception. With respect to that exception, Ohio common law has long permitted juries "to include reasonable attorney fees as part of *compensatory* damages when the jury also awards exemplary or punitive damages." *Cruz*, 207 N.E.3d at 750, 169 Ohio St.3d at 724 (emphasis added).

The exception does not mean that the award of attorney fees is automatic in every case in which punitive damages have been awarded. After all, the two types of damages serve distinct purposes. *See Neal-Pettit v. Lahman*, 125 Ohio St.3d 327, 2010-Ohio-1829, 928 N.E.2d 421, ¶ 14. Punitive damages focus on punishing the tortfeasor rather than on compensating the prevailing party, while attorney fees are intended primarily to compensate the prevailing party in cases that justify shifting fees. Here, however, Burer's actual malice in committing the tort of defamation is sufficient here to support an award of attorney fees as additional compensatory damages.

> [M]alice is the gateway to punitive damages in a tort case. In turn, a punitive damages award opens the door to attorney's fees.

*Chapel v. Wheeler Growth Co.*, 2023-Ohio-3988, ¶ 18, ___ N.E.3d ___, 2023 WL 7269268, at *5 (Ohio App. 1 Dist., Nov. 3, 2023). Calloway proved by clear and convincing evidence that Burer acted in bad faith and with actual malice when he made misrepresentations about Calloway during at least two diverted telephone calls prior to September 13, 2021, and further defamed Calloway in his November 10, 2021 Facebook post.

The calculation of a "reasonable" compensatory attorney fee to reimburse Calloway for prosecution of the defamation claim begins with a review of Calloway's billing records.

> The most useful starting point for determining the amount of a reasonable
> fee is the number of hours reasonably expended on the litigation multiplied
> by a reasonable hourly rate. This calculation provides an objective basis on
> which to make an initial estimate of the value of a lawyer's services.

*Hensley v. Eckerhart*, 103 S.Ct. 1933, 1939, 461 U.S. 424, 433 (1983).  Like the federal

courts, Ohio uses the same formula, commonly referred to as the "lodestar," as a starting

point for calculating a reasonable fee. *See Phoenix Lighting Group, L.L.C. v. Genlyte

Thomas Group, L.L.C.*, 153 N.E.3d 30, 33, 160 Ohio St.3d 32, 33 (2020); *Bittner v. Tri-

Cnty. Toyota, Inc.*, 569 N.E.2d 464, 466, 58 Ohio St.3d 143, 145 (1991).

On February 12, 2024, Calloway submitted 14 pages of detailed billing records in

connection with a separately-filed motion for attorney fees and expenses under Rule

54(d)(2), Fed. R. Civ. P. Those records reflect that six different attorneys billed at different

rates for their time in this case, including two Partners, a Managing Associate and three

Associates. The Court has examined the hourly billing rates of each attorney, and finds

those rates to fairly present the prevailing rates in the Greater Cincinnati area.

The fees billed between November 23, 2021 (prior to the filing of the January 7,

2022 complaint) and February 8, 2024 (Calloway's post-trial motions) total $178,793.50.

However, that total includes *all* time spent on *all* claims, including the fees that this Court

previously awarded as sanctions for Defendants' pretrial misconduct. Plaintiff's complaint

enumerates roughly a dozen separate "Counts." Even when duplicate causes of action

are eliminated, the complaint sets forth eight separate claims: 1) Deceptive trade

practices under Ohio law, (2) Trademark infringement under the Lanham Act, (3) Tortious

interference with contractual and business relationships under Ohio law, (4) Conversion,

(5) Defamation, (6) Breach of Fiduciary duty, (7) Misappropriation of confidential, trade

secret, & proprietary information, and (8) Civil Conspiracy. (*See* Doc. 65 at PageID 802

(summarizing causes of action)). In order to appropriately limit Calloway's recovery of fees to the single claim of defamation, the Court must ascertain the fees incurred for the prosecution of that claim, without unjustly awarding fees for the other seven claims to the extent those claims are separable.

To accomplish this, the Court considers the extent to which the defamation claim shared a common core of facts with Calloway's many other claims. The Court also considers how similar or dissimilar the legal elements of a claim of defamation is from Calloway's other legal theories of recovery. And the Court considers the overall results obtained, insofar as the compensatory damages on the defamation claim are just $10,000.00, as compared to larger compensatory damages on other claims, including $12,180.34 for breach of fiduciary duty, $15,122.64 for conversion of property, and $15,691.55 for Deceptive Trade Practices and Lanham Act violations.[48]

Both factually and legally, the defamation claim was distinct. Defamation is a relatively simple legal claim under Ohio law, and the evidence of such was easily presented without the need for significant discovery. In comparison to many claims that spanned a much broader time frame (from September 2020 through Calloway's analysis of "profits" through March 2023), the defamation claim spanned a narrow time frame. The November 10, 2021 FB post was the primary defamatory statement alleged and was used exclusively to support the defamation claim. At trial, Calloway proved that Burer also defamed Calloway during at least two diverted telephone calls (September 9 and

---

[48]In fashioning the appropriate fee that reasonably compensates Calloway for "reasonable" fees expended in pursuit of the defamation claim, this Court emphasizes that it makes no reduction based solely on "proportionality." Ohio courts generally do not consider "fee proportionality" unless a fee is so high that it "shocks the conscience." *Chapel v. Wheeler Growth Co.*, 2023-Ohio-3988, ¶ 26, ___ N.E.3d___, 2023 WL 7269268, at *7 (Ohio App. 1 Dist., 2023) (quoting *Bittner*, 58 Ohio St. 3d at 146). And the Ohio legislature has clearly stated that any award of attorney's fees is not subject to the cap on punitive damages. Ohio R.C. § 2315.21(D)(1)(c).

September 13, 2021) when he made statements disparaging Calloway's ability to perform the requested work while referring the callers to competitors. True, the diverted calls provided support for other claims (particularly deceptive practices), but the defamatory statements appeared to be limited to just two calls. Calloway required no discovery from Burer concerning those calls since the recordings were produced from its internal phone system. Similarly, Calloway obtained a copy of the single defamatory FB post (which was not disputed) without Burer's assistance in discovery.

Counsel's billing entries reflect a significant amount of research and writing devoted to many unrelated issues and claims.[49] There appears to have been little overlap of the elements of the defamation claim with any other legal theory presented. "Where, as here, the claims can be separated into a claim for which fees are recoverable and [claims] for which no fees are recoverable, the trial court must award fees only for the amount of time spent pursuing the claim for which fees may be awarded." *Bittner v. Tri-Cnty. Toyota, Inc.*, 569 N.E.2d at 466-67, 58 Ohio St.3d at 145 (additional citation omitted).

"In determining the appropriate attorney's fees award, Ohio courts, like federal district courts, "are not required to act as 'green-eyeshade accountants' and 'achieve auditing perfection' but instead must simply [ ] do 'rough justice.'" *Chapel v. Wheeler Growth Co.*, 2023-Ohio-3988, ¶ 20, ___ N.E.3d ___, 2023 WL 7269268, at *5 (Ohio App. 1 Dist., 2023) (quoting *Northeast Ohio Coalition for the Homeless v. Husted*, 831 F.3d 686 (6th Cir. 2016) (additional citations omitted)). Considering the total fees of $178,793.50, the Court will subtract the $19,001.00 in attorney fees previously awarded

---

[49]Very few billing entries reference "defamation," the phone calls or the FB post.

to avoid a double-recovery. (*See* Docs. 41, 59).[50] That leaves total attorney fees of $159,792.50.

Above, the Court has considered factors that suggest a significant reduction in the total fees billed is necessary and appropriate. But the Court also considers that no case is litigated piecemeal or "claim-by-claim." The fact that the defamation claim was relatively distinct cannot eliminate the reality that there was *some* evidentiary overlap with other claims. Nor does this Court ignore the unavoidable costs incurred in bringing any case to trial, many of which costs bear little relationship to the number of claims presented. Considering the record as a whole, therefore, the Court awards 35% of Calloway's litigation costs of $159,792.50, or $55,927.38, as a reasonable attorney fee to compensate Calloway for its costs in pursuing the defamation claim.

### F. Breach of Fiduciary Duty

In Count 8, Calloway seeks damages for breach of fiduciary duty, based on the alleged overcharges by Burer's Garage for the maintenance and repair of Calloway vehicles during Burer's employment. For the reasons previously discussed, the Court awards nothing on the claim of $5,000 in overcharges but awards $12,180.34 based on Burer's failure to abide by his agreement to offset the Burer Garage bills by an outstanding bill owed to Calloway by T.B. Properties.[51]

---

[50]For reasons that are not clear from the record, Calloway's billing records identify the sanctions sum as $18,933.00 rather than $19,001.00. In its motion for fees, Calloway also offers to subtract $3,850.00 in fees incurred in defense of Burer's DOL claim, insofar as Calloway sought the reimbursement of the same fees as damages in its case-in-chief. Above, the Court denies recovery of the DOL defense fees on the merits. By awarding only a portion of total fees incurred, the Court has adequately considered the relevant defamation claim costs in the context of the totality of the litigation.

[51]No specific allegations concerning the offset appear in Calloway's complaint, but Count 8 generally alleges that Burer's conduct caused Calloway "to spend more on vehicle repair than was necessary."

### G. Misappropriation of Trade Secrets

In Counts 9 and 10, Calloway seeks relief for misappropriation of trade secrets under state and federal law. *See* O.R.C. §§ 1333.62 and 1333.63 (Ohio Uniform Trade Secrets Act) and 18 U.S.C. § 1836(b)(3)(A) (federal Defend Trade Secrets Act). In its complaint, Calloway specifically alleges that, during his employment as GM, Burer obtained Calloway's customer database, pricing structure and financial information used to quote projects to customers and to target actual repeat and potential customers. Calloway maintains that all of that data is confidential and proprietary information and constitutes trade secrets. But Calloway presented no evidence about Burer's use of the said database, pricing structure, customer lists, or other financial information, or of Calloway's damages.[52] Given that lack of evidence, in combination with the lack of a confidentiality, non-compete, or non-solicitation agreement that prohibited Burer from contacting former customers with whom he was familiar, Calloway is not entitled to recover for these claims.

### H. Civil Conspiracy

In Count 11 of its complaint, Calloway alleges that Burer and 1 Call Away acted with malice in a civil conspiracy, through the redirection of phone calls through September 13, 2021, the conversion of stolen equipment, the use of Calloway's design and trademark, the misappropriation of Calloway's imagery on 1 Call Away's website, the misappropriation of Calloway's customer lists and trade secrets, and the disparagement

---

[52]The only relevant evidence appears to refute any premise that Burer used Calloway's pricing structure to underbid Calloway. The Court discredited Ms. Calloway's testimony that Burer interfered with an existing Calloway contract to perform the final phase of the Embassy Suites job for approximately $40,000. But even if the Court had believed that testimony, 1 Call Away's bid for that work was clearly higher, not lower. BMS Cat ultimately paid $45,000 to 1 Call Away for the work.

of Calloway and its work. As previously discussed, Calloway's proof of damages was very limited. In addition, this claim is premised on the allegation that Burer conspired with his own wholly-owned and operated business. At trial, Burer confirmed that he is the sole employee of 1 Call Away. Under Ohio law, a corporation cannot conspire with its own agents or employees. *See Cheryl & Co. v. Krueger*, 536 F. Supp. 3d 182, 214 (S.D. Ohio 2021) (discussing intra-corporate conspiracy doctrine). The Court therefore finds no damages owed under this claim.

IV.    **Conclusions and Order**

For the reasons discussed, Calloway is entitled to recover compensatory damages against Defendant Burer alone on its breach of fiduciary duty claim and for conversion, in the following sums: $12,180.34 (unpaid restoration bill); $1,500.00 (retained gift certificates), $4,036.15 (retained Iowa furniture), and $9,586.49 (retained Calloway dehumidifiers, camera equipment, and moisture meter).

Calloway is entitled to recover against both Defendants for the tort of defamation, in the amount of $10,000.00 in compensatory damages, $20,000.00 in punitive damages, and $55,927.38 in attorney fees.

In addition to the joint and several liability of both Defendants for defamation, Calloway is entitled to recover the sum of $5,691.55 (representing wrongfully diverted business opportunities) against both Defendants for their deceptive trade practices under Ohio law. And Calloway is entitled to recover against both Defendants the sum of $10,000.00 in statutory damages under the Lanham Act.

The Court declines to award prejudgment interest on any of the monetary damages. Under Ohio law, "[t]he choice to award prejudgment interest on a tortious-

conduct claim is a matter of discretion for the trial court." *Desai v. Franklin*, 895 N.E.2d 875, 887-88, 177 Ohio App.3d 679, 696, 2008-Ohio-3957, ¶ 31 (Ohio App. 9 Dist. 2008); *see also* R.C. § 1343.03(C). Prejudgment interest under the Lanham Act is similarly within the discretion of the trial court, and is normally reserved for "exceptional cases." *Wynn Oil Co. v. American Way Service Corp.*, No. 94-1294, 1995 WL 431019, at *3 (6th Cir., July 20, 1995) (Table, internal quotation marks and citation omitted); *see also Powerhouse Marks LLC v. Chi Hsin Impex, Inc.*, 463 F. Supp.2d 733, 740 (E.D. Mich. 2006) (finding prejudgment interest to be inappropriate in light of plaintiff's delay in asserting its trademark rights). By contrast, Calloway is entitled to post-judgment interest from the date of entry of judgment, to accrue at the current state statutory rate for all damages awarded under state law, *see* Ohio R.C. R.C. § 1343.03(B) and R.C. § 5703.47, and at the corresponding federal statutory rate for separate damages under the Lanham Act. *See* 28 U.S.C. § 1961.

In addition to the monetary damages awarded, the Court will grant Calloway's request for permanent injunctive relief. The bank account in the name of "BB Investment Properties, LLC DBA 1 Call Away Restoration" appears to be open and active. To ensure that Burer does not resurrect the name or further infringe upon Calloway's name and mark, Burer will be required to alter the name listed on the BB Investment Properties bank account in order to delete any reference to 1 Call Away. Burer and/or 1 Call Away also will be permanently enjoined from using the name "1 Call Away" or Calloway's imagery for any future business.

Accordingly, **IT IS ORDERED:**

1. Defendant Burer is individually liable for a total of $27,302.98 in compensatory

damages on the breach of fiduciary duty claim and the conversion claim;

2.  Defendant Burer and Defendant 1 Call Away are jointly and severally liable for $10,000.00 in compensatory damages, $20,000.00 in punitive damages, and $55,927.38 in attorney fees on the defamation claim.

3.  In addition to fees awarded on the defamation claim, Defendants are jointly and severally liable for $19,001.00 in attorney fees based on prior sanctions awards;

4.  Defendant Burer and Defendant 1 Call Away are jointly and severally liable for an additional $5,691.55 in damages for their deceptive trade practices under Ohio law;

5.  Defendant Burer and Defendant 1 Call Away are jointly and severally liable for $10,000.00 in damages under the Lanham Act;

6.  Within thirty (30) days of the date of this Order, Defendants shall either close or alter the name listed on the BB Investment Properties bank account in order to delete any reference to 1 Call Away. Defendants are further enjoined from using the name "1 Call Away" or Calloway's imagery for any future business;

7.  Calloway is entitled to post-judgment interest.


_s/Stephanie K. Bowman_____
Stephanie K. Bowman
United States Magistrate Judge